**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RAYMOND LEE WAGNER, Jr.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 3:14-CV-1831** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **INTERNATIONAL AUTOMOTIVE** | ) | |
| **COMPONENTS GROUP NORTH** | ) | |
| **AMERICA, INC.; CAD ENGINEERING** | ) | |
| **RESOURCES INC., D/B/A CER GROUP** | ) | |
| **N.A., INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Defendants International Automotive Components Group North America, Inc. ("IAC")

and CAD Engineering Resources Inc. d/b/a CER Group, N.A., Inc. ("CER") (together, the

"defendants") have jointly filed a mislabeled "Motion to Dismiss Plaintiff's Second Amended

Complaint" (Docket No. 97) that is, in fact, a motion for summary judgment under Federal Rule

of Civil Procedure 56.[1]  Plaintiff Raymond Lee Wagner, Jr. ("Wagner") has filed a Response

(Docket No. 106) and the defendants have filed a joint Reply (Docket No. 111).  For the

following reasons, the Motion will be granted.

---

[1] The motion states that it is being filed "pursuant to FRCP 56," and the court entered an
Order informing the parties that it was being treated as such.  (Docket No. 100.)

## FACTS[2]

This case concerns a personal injury suffered by Wagner while working on premises operated by the defendants. Wagner is a resident of Charleston County, South Carolina. IAC is incorporated in Delaware and operates a facility located in Springfield, Tennessee that manufactures automobile components ("Springfield Plant"). CER is a Michigan Corporation that provided staffing services to IAC for the Springfield Plant.

Wagner was an employee of the temporary staffing services company TrueBlue, Inc. d/b/a Labor Ready ("True Blue"). True Blue entered into a contract with CER and IAC whereby True Blue employees were assigned to perform work for the defendants on a temporary basis. Pursuant to this arrangement, Wagner was assigned to perform work at the Springfield Plant.[3] Wagner was performing the work of the defendants on the day of his injury.[4]

------

[2] Facts are drawn from the defendants' Statement of Undisputed Facts (Docket No. 99), Wagner Response thereto and Statement of Additional Material Facts (Docket No. 107), the defendants' response to Wagner's Statement of Additional Material Facts (Docket No. 111), and the evidentiary record as a whole. The court must note, however, that Wagner's response to the defendants' Statement of Material Facts is deficient and does not comply with the Local Rules. Wagner repeatedly fails to support alleged disputes of fact with specific citations to the record and, often, simply states "disputed." More specifically, Wagner's responses to statements of fact number 5, 6, 7, 8, 9, 11, 12, 13, 15, and 18 contain no citations to any record evidence. Thus, as to these paragraphs, Wagner has not established a dispute of material fact as required, and the facts adduced therein by the defendants are deemed admitted pursuant to Local Rule 56.01(g).

[3] Wagner did not have a written contract with the defendants. However, this court has previously held that, under Tennessee law, Wagner had an implied contract with the defendants. (*See* Docket No. 98-2 at p. 5.)

[4] On August 11, 2013, Wagner was placing material into a machine used to form material into a certain permanent form (*i.e.*, a "mold press"), when the press resumed operation and came crushing down on Wagner's body. Whether or not this injury was the result of Wagner's or the defendants' negligence is the underlying claim in this action; however, it is not the legal question at issue in this motion. Accordingly, disputes of fact as to the circumstances of Wagner's injuries are immaterial.

True Blue's "Offer to Supply Temporary Workers," which was sent to defendant CER (the "Offer"), provides that the "[c]ustomer must provide adequate supervision." (Docket No. 98-3.) The Offer was part of the contract between True Blue and the defendants.[5] (Docket No. 98-7 at p. 19.)

True Blue supplied the defendants with a "Work Ticket" for Wagner prior to the day of his injury.[6] True Blue's "Work Ticket," including the terms and conditions attached thereto, governs the conditions of Wagner's employment and is part of True Blue's contract with the defendants. (*Id*. at pp. 16-18.) The Work Ticket expressly provides that the "[c]ustomer agrees that True Blue workers are under Customer's supervision, direction and control." (Docket No. 98-4.)

IAC's "Master Agreement" with CER/True Blue provides that "Supplier [in this case, Wagner] shall take direction from and consult exclusively with the IACNA Service Representative in connection with the performance of services under this Agreement." (Docket No. 98-5.) An Addendum to the Master Agreement provides that the "[c]ustomer understands that True Blue will not be providing supervision for its temporary employee(s) under the Agreement and that Customer shall be responsible for adequately and reasonably supervising and directing the activities of True Blue's temporary employee(s). (Docket No. 98-6, ¶ 3.) The

_____

[5] True Blue's Offer is unsigned, but Wagner has offered no record evidence to establish that this practice is out of the ordinary or would disqualify this document from consideration under the relevant analysis – particularly since True Blue has adduced unrebutted deposition testimony that the Offer was accepted.

[6] Wagner attempts to create a dispute of material fact by misquoting testimony that "some documents" were sent after the date of Wagner's injury. (Docket No. 111 at p. 8.) This non-specific reference however, does not rebut the defendants' specific deposition testimony that Wagner's Work Ticket was sent by True Blue prior to the date of his injury.

Addendum was executed on August 19, 2013. (*Id*.) On September 10, 2013, True Blue executed an acknowledgment that purported to agree that the Master Agreement retroactively governed the relationship of True Blue and the defendants to January 1, 2013. (Docket No. 98-11.)

True Blue does not design or build automobile parts (IAC's business) or employ anyone who has the knowledge or expertise to supervise employees who do. (Docket No. 98-7 at pp. 6-7.) True Blue's customer "always" controls the details of its associates' employment once assigned, and True Blue never assigns any employees of its own to do so. (*Id*. at pp. 9-10.) When True Blue's associates are assigned to a customer, they are given a customer contact to seek out upon arrival who manages their breaks and lunches and instructs them on performing their duties. (*Id*. at pp. 10-11.) In Wagner's case, he was directed to seek out Marty Stahl, an IAC employee, and, if Stahl was not available, to take direction from Alan Lambert, an employee of CER. (*Id*. at pp. 15-16.) True Blue had no employees at IAC's Springfield Plant supervising Wagner or anyone else. (*Id*. at p. 22.)

In hiring new employees, True Blue conducts the application process, engaging its employees in a behavioral assessment survey and a verification program through the Department of Homeland Security. The decision to hire employees is based on True Blue's assessment of the individual's qualifications. what each customer may need, and an evaluation of which of True Blue's individual employees can perform the necessary duties of an assignment. As a standard practice, True Blue does not provide customer-specific training. True Blue screens its employees for individuals who can handle the available work, confirms each employee's capabilities, communicates the rate of pay, and provides the necessary personal protective equipment for each employee. True Blue gives its employees the details of the job that they will be performing and

then dispatches them to work on the job. True Blue carries workers' compensation coverage and unemployment insurance for its employees, and controls the tax withholdings. True Blue receives payments from its customers and directly pays its employees. Accordingly, Wagner was paid by True Blue and was not compensated directly by the defendants.

## PROCEDURAL BACKGROUND

Wagner filed the Amended Complaint on October 24, 2014. (Docket No. 26.) Wagner brings claims against the defendants based upon multiple theories of liability, all but one of which sounds in simple negligence.[7] These claims include: (1) failure to properly hire and train the employee who worked with Wagner; (2) failure to train Wagner; (3) failure to adequately warn Wagner of dangers at the Springfield Plant; (4) failure to provide a safe working environment; (5) operation of the mold press in a defective manner or condition; (6) failure to provide adequate safeguards to prevent direct employee exposure to the mold press; and (7) failure to adequately maintain the mold press. The Amended Complaint does not contain any claim premised upon reckless or intentional conduct. On June 9, 2015, Wagner filed a Second Amended Complaint, adding two additional defendants, who were subsequently dismissed from the case. (Docket No. 96.) The remainder of Wagner's Second Amended Complaint contains no substantive differences from his Amended Complaint as to the remaining defendants.

In response to the Amended Complaint, the defendants moved to dismiss based upon the exclusivity provision of Tenn. Code Ann. § 50-6-108. This statute provides that workers' compensation insurance benefits are the exclusive remedy for individuals who are injured while working, unless there is actual intent of the employer to injure the employee. *See Valencia v.*

---

[7] The plaintiff also alleges a violation of Tenn. Code Ann. § 50-3-105, an occupational safety and health statute that probably does not provide for a private right of action.

*Freeland and Lemm Constr. Co.*, 108 S.W.3d 239, 242 (Tenn. 2003) (citing *Liberty Mut. Ins. Co. v. Stevenson*, 368 S.W.2d 760 (Tenn. 1963)). The defendants contended that the Amended Complaint should be dismissed because Wagner had only asserted claims for ordinary negligence and had failed to bring any claim alleging actual intent to injure. The defendants invoked the "borrowed servant" or "loaned employee" doctrine ("Borrowed Servant Doctrine"), under which a plaintiff's status as a temporary employee does not negate the exclusivity of the workers' compensation system, if it is determined that an employee's actual employer lends the employee to a "special employer" to perform certain duties. The defendants claimed that they were Wagner's "special employer" for purposes of the Borrowed Servant Doctrine. In response, Wagner argued that there were insufficient grounds for the court to find that he was a borrowed servant of the defendants.

In its Memorandum Opinion denying Defendants' 12(b)(6) motion, the court held that Wagner admitted in his Amended Complaint that the "first two elements of the Borrowed Servant Doctrine are met here." (Docket No. 49 at p. 5.) Therefore, the only issue was as to the third element of the Borrowed Servant Doctrine – whether the defendants had the right to control Wagner's work. (*Id*. at pp. 8-9.) Specifically, because Wagner's Amended Complaint added the allegation that "True Blue retained the ability to control the work to be performed by Plaintiff," the court held:

> At this stage of the case, Wagner is entitled to his well-pleaded allegation that True Blue, and not the defendants, retained control over his employment . . . . Wagner is entitled to discover and offer evidence to support the claim that his work was directed by True Blue. Evidence gathered in discovery in this case may or may not establish that the defendants exercised control over and supervision of Wagner during the relevant time frame at the Springfield Plant. The defendants may, at the appropriate time, choose to file a motion for summary judgment re-asserting the defense of the exclusivity provision of Tenn. Code Ann.

50-6-108 and the Borrowed Servant Doctrine.  For now, this action will
proceed."

(*Id.*)

On November 5, 2015, with the benefit of discovery, the defendants have now filed a

joint Motion for Summary Judgment.  (Docket No. 97.)  In the Motion, the defendants contend

that the undisputed facts of record establish that the defendants had the right to control Wagner's

actual work at the Springfield Plant, thereby fulfilling the third prong of the Borrowed Servant

Doctrine test and triggering the exclusivity provision of Tenn. Code Ann. § 50-6-108.  On

December 11, 2015, Wagner filed a Response.  (Docket No. 106).  On December 23, 2015, the

defendants filed a Reply.  (Docket No. 110.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary

judgment if "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant

shows that there is no genuine issue of material fact as to at least one essential element of the

plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings,

"set[ting] forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of*

*Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

322-23 (1986).  "In evaluating the evidence, the court must draw all inferences in the light most

favorable to the non-moving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the

truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable."  *Anderson*, 477 U.S. at 252.  An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party.  *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

Pursuant to Tenn. Code Ann. § 50-6-108(a), the workers' compensation remedy available to Wagner is exclusive: "The rights and remedies granted to an employee subject to this chapter, on account of personal injury or death by accident . . . shall exclude all other rights and remedies of the employee, the employee's representative, dependents or next of kin, at common law or otherwise, on account of the injury or death."  The Tennessee Supreme Court has routinely upheld this statute. "Pursuant to this section, workers' compensation law provides the exclusive remedy for an employee who is injured during the course and scope of his employment, meaning the employee is precluded from seeking tort damages for the injury." *Valencia v. Freeland & Lemm Constr. Co.*, 108 S.W.3d 239, 242 (Tenn. 2003) (citing Liberty Mut. Ins. Co. v. Stevenson, 212 Tenn. 178, 368 S.W.2d 760 (1963)).  Here, Wagner attempts to recover damages in tort from the defendants, customers of his formal employer, the temporary staffing company True Blue.

However, the Borrowed Servant Doctrine applies if (1) an employee has made a contract of hire, express or implied, with the special employer, (2) the work being done by the employee is essentially that of the special employer, and (3) the special employer has the right to control the details of the employee's work. *Catlett v. Indem. Ins. Co. of N. Am.*, 813 S.W.2d 411, 414-15

8

(Tenn. 1991) (citing *Winchester v. Seay*, 409 S.W.2d 378 (Tenn. 1966)); *Bennett v. Mid-South Terminals Corp.*, 660 S.W.2d 799, 801 (Tenn. Ct. App. 1983)).  Once these elements are satisfied, the special employer is treated as the employee's direct employer for purposes of the exclusivity of the workers' compensation system.  *Bennett*, 660 S.W.2d at 802 (citing *Carpenter v. Hooker Chem. & Plastics Corp.*, 553 S.W.2d 356 (Tenn. Ct. App. 1977)).

The cout has previously held that the first two elements of the Borrowed Servant Doctrine are met here.  First, under Tennessee law, Wagner has an implied contract with the defendants. When a worker knowingly becomes an employee of a temporary services agency, he generally consents to work for special employers.  *Bennett*, 660 S.W.2d at 801-02.  In this situation, the law presumes that Wagner knew that all of his work would be performed for the various customers of temporary services provider True Blue.  The defendants were two of those customers.  Because Wagner consented to work for the defendants through his employment by True Blue, an implied contract existed between Wagner and the defendants.  *See id.*  Second, Wagner was doing the work of the defendants. The defendants manufacture automobile components; Wagner acknowledges that, at the time of his injury, he was loading material into a mold press at the defendants' Springfield Plant for that purpose.  Nothing has changed regarding these rulings; they are the law of the case and need not be revisited.  *See Coal Resources, Inc v Gulf & Western Industries, Inc.*, 865 F 2d 761, 766 (6th Cir. 1989).

As to the third element, the cases are uniform in holding that it is the right to control, not the exercise of control, which is most important.  *See Stratton v. Un. Inter-Mountain Tel. Co.*, 695 S.W.2d 947, 953 (Tenn. 1985).  "The test is not whether the right to control was exercised but merely whether the right to control existed."  *Id*. at 950.  The key question, therefore, is

whether the defendants had the ability to control the details of Wagner's employment. The court

finds that, based on the record before it, there can be no genuine factual question that the

defendants had the right to control the details of Wagner's work.

First, the Offer that was sent by True Blue to CER and became the basis for the provision

of Wagner's services clearly states that the "[c]ustomer must provide adequate supervision."

True Blue's Corporate Representative, Patricia Earles, confirmed in unrebutted testimony that

this Offer became part of the contract between True Blue and the defendants and that customers

such as the defendants accept associates such as Wagner subject to the terms set forth therein.

Second, there is a Work Ticket that specifically relates to Wagner's assignment to the

defendants on the date of his injury. Earles testified that this Work Ticket provides the terms and

conditions pursuant to which True Blue's employee are staffed to customers:

Q.  Okay.  What is this document?
A.  It is a work ticket that the employees are dispatched out on when they go out on an
assignment.
Q.  And who does this work ticket go to?
A  The customer.
Q.  And is this the kind of document [True Blue] normally uses for all of its customers?
A.  Yes.

(Docket No. 98-7 at p. 14.)  Earles further testified that the terms and conditions attached to the

Work Ticket become part of the contract between True Blue and its customers, and did so, in

fact, in the case of Mr. Wagner's assignment to the defendants on the date of his injury:

Q.  And turning now to the second page, it says "Conditions of Service"?
A.  Uh-huh.  Yes, sir.
Q.  Are you familiar with these conditions of service?
A.  Yes.
Q.  And are these conditions of service normally attached to [True Blue's] documents?
A.  Yes.
Q.  Okay.  And are they provided to [True Blue's] customers?
A.  Yes.

Q. Okay. And do these provide the terms under which [True Blue] agrees to supply its associates to its customers?

A. Yes.

Q. And by accepting the associates, are the customers agreeing to these terms of service?

A. Yes, sir.

Q. Okay. Does [True Blue] attach these terms of service to all its work tickets?

A. Yes.

Q. And these are attached to Mr. - the work ticket for Mr. Wagner. Were these the terms and conditions of service in effect between [True Blue] and IAC on the date of Mr. Wagner's employment at IAC?

A. The -- okay.

Q. That was kind of a long-winded question. I'll ask it another way.

A. Thank you.

Q. The work ticket is being supplied by [True Blue] to IAC with these terms and conditions, right?

A. The work ticket was being supplied to Lean Production, Account Engineering, with those terms and conditions.

Q. To CER?

A. Correct. Yes.

Q. Okay. So by accepting Mr. Wagner's employment -- or temporary employment, I guess is the term, was CER agreeing to these conditions of service?

A. Yes, sir.

Q. Okay. And CER did in fact accept Mr. Wagner under these terms and conditions?

A. Yes, sir.

Q. Correct?

A. Yes, sir.

(*Id*. at pp. 16-18.) Critically, the Work Ticket expressly provides: "Customer agrees that [True Blue] *workers are under Customer's supervision, direction and control*." (Docket No. 98-4 (emphasis added).) This unrebutted, unequivocal document, agreed to by, and delivered to, the defendants prior to Wagner's accident, establishes that the defendants had the right to control Wagner while he was working at the Springfield Plant.

The defendants' position is strengthened further by the unrebutted testimony of True Blue's corporate representative, Patricia Earles. She testified that True Blue not only did not control Wagner while he was at the Springfield Plant, but would have been unequipped to do so. Specifically, Earles testified that (1) True Blue does not design or build auto parts (IAC's

business) or employ anyone who has the knowledge or expertise to supervise employees who do. (Docket No. 98-7 at p. 6); (2) True Blue's customers "always" control the details of True Blue associates' employment, once assigned, and True Blue never assigns any employees of its own to do so (*id*. at pp. 9-10); (3) when True Blue's associates are assigned to a customer, they are given a customer contact to seek out upon arrival who manages their breaks and lunches and instructs them on performing their duties (*id*. at pp. 10-11); (4) in Wagner's case, he was directed to seek out Marty Stahl, an IAC employee, and, if Stahl was not available, to take direction from Alan Lambert, an employee of CER (*id*. at pp. 15-16); and (5) True Blue had no employees at the Springfield Plant supervising Wagner or anyone else (*id*. at p. 22).

The services provided by True Blue – *e.g.*, employment background screening, payroll, insurance processing, withholding, making of work assignments, dispatching – are of a purely human resources nature and do not directly relate to the control of Wagner at the Springfield Plant. Indeed, True Blue does not even provide employer-specific training as a standard practice, relying on its customers to do so. Finally, when asked if True Blue "assigns its own employees to direct and control the employment activities of the associates it provides to customers," Ms. Earles responded "no." (Docket No. 98-7 at p. 19.) But, most importantly, the ability of True Blue to exert some degree of control over Wagner is essentially immaterial, because the legal question before the court is not whether *True Blue* had rights to control Wagner, but whether the *defendants* had the right to control Wagner *as well*.[8] Thus, even if, as

---

[8] The bulk of the Response fundamentally misapprehends this point, merely arguing that True Blue had some control over Wagner. This misses the mark. On the day of Wagner's injury at the Springfield Plant, it was the right of the defendants to control what Wagner did and how he did it. *See Bennett*, 660 S.W.2d at 802. This definitively establishes that the defendants were Wagner's co-employers for purposes of the exclusivity provision. *Id*.

Wagner argues, True Blue retained some control over the administrative aspects of Wagner's employ, if the defendants had the right to control Wagner, as is the case here, Wagner cannot escape application of the Borrowed Servant Doctrine.[9]

Accordingly, the facts of this matter compel a conclusion that all three elements of the Borrowed Servant Doctrine are satisfied. As a result, Wagner's claims are subject to the workers' compensation exclusivity provided for in Tenn. Code Ann. § 50-6-108(a). *See, e.g., Abbott v. Klote Int'l Corp.*, No. 03A01-9810-cv-00328, 1999 WL 172646 at *3 (Tenn. Ct. App. Mar. 24, 1999) ("Under established Tennessee precedent, an employee of a temporary manpower service is considered also to be an employee of the company to which the employee is assigned, for workers' compensation purposes."); *Bennett*, 660 S.W.2d at 802 (holding that, where the defendant was a co-employer of the temporary employee at the time of his alleged injury, the plaintiff's right to recover is limited to the rights afforded him under the Worker's Compensation Act). The defendants, therefore, are entitled to summary judgement.

---

[9] The Response also faults the defendants for relying on the Addendum to the Master Agreement between True Blue and the defendants, which was dated shortly after Wagner's accident, to reinforce that the defendants controlled Wagner. Although the defendants offer an excuse as to why this document might have been signed late, the court views it with some suspicion. However, given the other clear and unrebutted evidence of record, the court need not consider this document to rule on the pending motion.

## CONCLUSION

The defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (*i.e.*, Rule 56 Motion) (Docket No. 97) will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge